UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

JAMES E. MERRILL, D.O.,

        Plaintiff,

   v.                                     Case No. 07-C-938

AGNESIAN HEALTHCARE, INC.,

        Defendant.

**DECISION AND ORDER DENYING DEFENDANT'S
MOTION FOR SUMMARY JUDGMENT**

A Wisconsin statute requires that osteopathic physicians be afforded an equal opportunity to obtain hospital staff privileges and prohibits the denial of such privileges solely because the applicant is an osteopathic physician. Wis. Stat. § 50.36(3)(a). Plaintiff James E. Merrill, D.O., filed this diversity lawsuit against Defendant Agnesian Healthcare, Inc. ("Agnesian"), alleging that Agnesian violated this statute when it failed to timely approve his application for staff privileges as an Obstetrician/Gynecologist at St. Agnes Hospital, which is owned and operated by Agnesian. Dr. Merrill claims that his application was, in effect, denied, solely because he is an osteopathic physician. The case is before me on Agnesian's motion for summary judgment. Agnesian contends it is entitled to summary judgment because the evidence conclusively establishes that Dr. Merrill's application for staff privileges at St. Agnes was not denied, but was in fact granted before he filed suit. Furthermore, Agnesian argues that Dr. Merrill is barred from seeking damages because he released St. Agnes Hospital from any civil liability in processing his application for medical staff

privileges. Finally, even if a violation of Wis. Stat. § 50.36(3)(a) can be shown, Agnesian argues that the hospital is immune from liability under Wis. Stat. § 146.37(1)(g). For the reasons that follow, Agnesian's motion will be denied.

## BACKGROUND

Dr. James Merrill is an osteopathic Obstetrician/Gynecologist ("Ob/Gyn"). He attended the University of Osteopathic Medicine and Health Science in Des Moines, Iowa, and completed a residency in obstetrics and gynecology under the auspices of the American Osteopathic Association ("AOA"). Dr. Merrill is board certified by the American Osteopathic Board of Obstetricians and Gynecologists ("AOBOG"). (Def. PFOF ¶¶ 16-18.) In 2007, after twelve years of practice as an Ob/Gyn in Iron Mountain, Michigan, Dr. Merrill decided to relocate to Fond du Lac, Wisconsin to be closer to his parents, who were in poor health. Dr. Merrill was offered employment with Aurora Medical Group starting June 4, 2007. Aurora's offer was contingent upon Dr. Merrill being granted staff privileges at St. Agnes, the only hospital serving the Fond du Lac community, by his starting date. (Pl. PFOF ¶¶ 4-6.)

In anticipation of the move, Dr. Merrill purchased a house in Fond du Lac and enrolled his children in school for the fall semester. He closed his medical practice in Iron Mountain in late February or early March 2007 in order to provide his staff reasonable opportunity to find new employment and to provide patients adequate time to find alternative medical care. He stopped accepting new patients because he did not want to leave them in the middle of gestation.

On or about March 8, 2007, Dr. Merrill received an application for membership to the St. Agnes Hospital Medical Staff. A letter accompanying the application explained the procedure that

2

would be followed and informed Dr. Merrill that "at best, the credentialing process will cover 3 to 4 months". (Def. PFOF ¶¶ 6, 7.) According to the letter, the application would be reviewed by the Hospital credentialing Committee within 45 days of receipt and within one week thereafter would be reviewed by the Department credentialing committee. The letter estimated that the application would be presented to the Medical Executive Committee for a recommendation for approval/ deferral/rejection in May 2007, and then to the Governing Board in June 2007. (Def. PFOF ¶¶ 8-11.) Dr. Merrill completed the application by March 15, 2007. (Pl. PFOF ¶ 20.)

Dr. Merrill was also furnished a copy of the current Hospital Bylaws. Although the Bylaws generally authorized appointment of osteopathic physicians with AOA approved residencies and board certifications, they also provided: "Board certification requirements shall be determined at the department level, and become part of the Department Rules and Regulations." (Aff. of James Mugan, Ex. B, sec. 2.) The Department of Obstetrics Rules and Regulations then in effect required applicants for staff privileges at St. Agnes to be certified by the American Board of Obstetrics and Gynecology ("ABOG") and made no provision for osteopathic physicians with AOBOG certifications.

On April 24, 2007, Dr. Karen L. Meyer, Chair of the Ob/Gyn Department at St. Agnes, wrote Dr. Merrill informing him that his current certification status did not satisfy the department's credentialing requirements. (Burnett Decl. Ex. G; PPFOF ¶¶ 33-34.) Dr. Meyer noted that Dr. Merrill's credentials were deficient in that he was not certified by the ABOG. She informed Dr. Merrill that the decision was based upon a "careful review, evaluation and comparison of the education, experience and training requirements imposed by the . . . AOBOG . . . and ABOG." (Burnett Decl. Ex. G.)

3

On June 8, 2007, the credentials committee of St. Agnes Hospital recommended that Dr. Merrill be granted credentials. (PPFOF ¶ 48.) Members of the Ob/Ggyn Department met again on that same date, however, and again refused to approve Dr. Merrill's application for privileges as he was certified only by the AOBOG and not by the ABOG. (*Id.* at ¶¶ 50-51.) Dr. Meyer was again the bearer of bad news for Dr. Merrill, as she wrote him on June 18, 2007 and indicated that since he was not certified by the ABOG, he did not satisfy the requirements of the bylaws and regulations of the hospital. (Def.'s Resp. to PPFOF ¶ 53.) Dr. Meyer explained in her letter that Dr. Merrill's application was "technically incomplete" and as a result "is automatically withdrawn and will not be subject to further consideration by the medical staff." (*Id.*) Since there was no denial of the application on its merits, Dr. Merrill was also informed that he was not entitled to any procedural due process rights. (*Id.*) Agnesian admits that as of the date of this letter, Dr. Merrill was incapable of completing the application process as he was ineligible to sit or apply for ABOG certification. (PPFOF ¶ 54.)

On July 12, 2007, Dr. Ronald Ayres, Chairman of the American Osteopathic Board of Obstetrics and Gynecology, wrote Dr. Meyer and explained the extensive requirements for AOA board certification. Dr. Ayres explained that AOA certification was recognized and accepted by hospitals, third party payers, and federal and state government agencies, and disputed Dr. Meyer's suggestion in her letter to Dr. Merrill that AOBOG certification was substandard. (PPFOF ¶¶ 63-66.) Notwithstanding Dr. Ayres' efforts, Dr. Theodore Miller, Chief of the St. Agnes Medical Staff, sent a letter to Dr. Merrill on July 23, 2007, and informed him that a denial of credentialing for competency would result in an event reportable to the National Practitioner Data Bank ("NPDB"), but that no such report would need to issue if his application were withdrawn. (Def.'s Resp. to

4

PPFOF ¶ 69.) A report in the NPDB would be a significant negative development in a physician's career. (PPFOF ¶ 70.)

The Ob/Gyn department at St. Agnes reversed course on October 11, 2007, when it changed its rules to allow for the granting of privileges to physicians who were board certified by the AOBOG. (*Id*. at ¶ 71.) This change in policy was apparently prompted by a concern that the hospital could lose its eligibility to care for Medicare patients if it continued to deny certification to osteopathic-board certified physicians. (*Id*. at ¶ 72.) That same day the department's credentials committee approved Dr. Merrill's credentials. (*Id*. at ¶ 73; Mugan Aff. Ex. D.) Dr. Merrill was informed by a letter dated December 6, 2007, that he had been granted privileges (DPFOF ¶ 47; Mugan Aff. Ex. E.) By that time, however, Aurora had withdrawn its employment offer and Dr. Merrill had returned to the Upper Peninsula to re-establish his medical practice there. (PPFOF ¶ 83.)

**ANALYSIS**

**I. Summary Judgment Standard**

Summary judgment is proper if the pleadings, depositions, answers to interrogatories, and admissions on file, together with any affidavits, show that there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The moving party has the initial burden of demonstrating that it is entitled to summary judgment. *Celotex*, 477 U.S. at 323. Once this burden is met, the nonmoving party must designate specific facts to support or defend its case. *Id.* at 322-24.

In analyzing whether a question of fact exists, the court construes the evidence in the light most favorable to the party opposing the motion. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242,

5

255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The mere existence of some factual dispute does not defeat a summary judgment motion, however; there must be a genuine issue of material fact for the case to survive. *Id.* at 247-48. "Material" means that the factual dispute must be outcome-determinative under governing law. *Contreras v. City of Chi.*, 119 F.3d 1286, 1291 (7th Cir. 1997). Additionally, the nonmoving party "cannot ward off summary judgment with an affidavit or deposition based on rumor or conjecture." *Palucki v. Sears, Roebuck & Co.*, 879 F.2d 1568, 1572 (7th Cir. 1989).

A "genuine" issue of material fact requires specific and sufficient evidence that, if believed by a jury, would actually support a verdict in the nonmovant's favor. Fed. R. Civ. P. 56(e); *Anderson*, 477 U.S. at 249. Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).

Failure to support any essential element of a claim renders all other facts immaterial. *Celotex*, 477 U.S. at 323. Therefore, summary judgment is appropriate against a party who, after adequate time for discovery and in the face of a properly supported summary judgment motion, fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. *Id.* at 322.

**II. Violation of Wis. Stat. § 50.36(3)(a)**

Dr. Merrill claims that Agnesian violated a Wisconsin statute which protects osteopathic physicians from being discriminated against in the granting of hospital staff privileges. The statute reads:

6

> Any person licensed to practice medicine and surgery under subch. II of ch. 448 or podiatry under subch. IV of ch. 448 shall be afforded an equal opportunity to obtain hospital staff privileges and may not be denied hospital staff privileges solely for the reason that the person is an osteopathic physician and surgeon or a podiatrist. Each individual hospital shall retain the right to determine whether the applicant's training, experience and demonstrated competence is sufficient to justify the granting of hospital staff privileges or is sufficient to justify the granting of limited hospital staff privileges.

Wis. Stat. § 50.36(3)(a). The Wisconsin courts have yet to interpret the language of Wis. Stat. § 50.36(3)(a) as it relates to what might constitute denial of an application for privileges. The statute itself affords osteopathic physicians both "equal opportunity to obtain hospital staff privileges" and protection against the denial of such privileges solely on account of their status as an osteopathic physician.

The initial question before the Court is whether a finder of fact could reasonably find that Agnesian's conduct amounted to a either (1) a denial of Dr. Merrill's application prohibited by the statute or (2) a failure to afford Dr. Merrill an equal opportunity to obtain privileges. Agnesian argues that it is entitled to summary judgment as Dr. Merrill cannot prove that he was ever denied medical staff privileges, something it contends is necessary in order for him to prevail in his claim under the statute. Agnesian hangs its hat on the undisputed fact that Dr. Merrill was in fact granted medical staff privileges in December 2007 and its contention that it never actually denied him privileges or made the concomitant negative reporting to the NPDB.

A hospital cannot avoid liability under § 50.36(3)(a), however, by the simple expedient of delaying action on an application or considering it withdrawn. One of the accepted definitions of the word "deny" is "to refuse to grant." *Merriam-Webster's Collegiate Dictionary* 309 (10th ed. 1999). Based on the evidence that Dr. Meyer told Dr. Merrill that his application would not be

7

considered complete in the absence of the ABOG certification and that his application was considered withdrawn, a jury could reasonably conclude that Agnesian did in fact deny Dr. Merrill's application for staff privileges at St. Agnes Hospital, even though it avoided using the word "deny." The fact that Agnesian did not use the word deny does not insulate it from liability. If not using the word "deny" was enough to avoid triggering § 50.36(3)(a), then any hospital could circumvent the statute simply by calling any application that it refused to grant withdrawn. It is the action Agnesian took, and not the words it used, that controls.

Agnesian's decision not to approve an application of an otherwise qualified applicant could also be considered a constructive denial of the application. Although the Court is unaware of any Wisconsin cases finding constructive denial of medical staff privileges under § 50.36(3)(a), Wisconsin law does recognize constructive acts in other contexts. For example, the state recognizes constructive discharge of employees and constructive eviction of lessees. *Strozinsky v. School Dist. of Brown Deer*; 2000 WI 97, ¶ 68, 237 Wis. 2d 19, ¶ 68, 614 N.W.2d 443, ¶ 68 ("The doctrine of constructive discharge recognizes that some resignations are coerced, tantamount to a termination."); *First Wisconsin Trust Co. v. L. Wiemann Co.*, 93 Wis. 2d 258, 269, 286 N.W.2d 360, 365 (Wis. 1980) (constructive eviction exists where tenant is deprived of full use and enjoyment of leased property for a material period of time). At the very least, the evidence would allow a jury to conclude that Dr. Merrill was not afforded an equal opportunity to obtain hospital staff privileges.

Agnesian next argues that even if its action can be construed as a denial of Dr. Merrill's application, there is no evidence from which a jury could find that the sole reason for the denial was because he was an osteopathic physician. (Def.'s Br. at 9.) In this regard, Agnesian notes that the

8

statute expressly acknowledges the hospital's right to evaluate its medical staff: "Each individual hospital shall retain the right to determine whether the applicant's training, experience and demonstrated competence is sufficient to justify the granting of hospital staff privileges or is sufficient to justify the granting of limited hospital staff privileges." § 50.36(3)(a). In insisting that all Ob/Gyn practitioners be certified by the ABOG, Agnesian claims that the Ob/Gyn department was simply fulfilling its responsibility to insure that all physicians granted Ob/Gyn privileges had sufficient competence to provide the quality of care required. The department had made its own determination that residency programs approved by the American Counsel of Graduate Medical Education ("ACGME") were more rigorous than those approved by the AOA. Thus, Agnesian contends, its initial refusal to grant Dr. Merrill staff privileges was not because he was an osteopath, but because he lacked the qualifications that the department reasonably thought essential.

Dr. Merrill argues in response that Agnesian is drawing a distinction without a difference, one "only a lawyer could love." (Pl.'s Br. at 19.) He may be right. On the surface, it makes little sense to prohibit a hospital from denying staff privileges to a physician solely because he is an osteopath, while at the same time permitting the hospital to deny privileges because the applicant completed a residency approved by the AOA, as opposed to the ACGME. Dr. Merrill notes that in order to obtain a certification by the ABOG, as Agnesian required, he would have had to attend a non-osteopathic based residency program. (*Id.* at 19-20.) This would seem inconsistent with the intent of § 50.36(3)(a) to prohibit hospitals from discriminating against osteopathic physicians. If Agnesian had specifically looked into the residency that Dr. Merrill had completed and raised concerns over the training he actually received, it might be reasonable to argue that its refusal to grant his application was simply an exercise of its responsibility to insure that only competent

9

Ob/Gyn practitioners were granted staff privileges. But the record discloses no such individualized inquiry. It thus appears that the only reason for its rejection was because he had those certifications that a qualified osteopathic physician would have and lacked those that a non-osteopathic physician would have. This at least suggests that Agnesian was discriminating against osteopaths. Even more telling is the fact that once the department changed its rules to eliminate the requirement that all applicants be ABOG certified, Dr. Merrill's application was immediately approved without further inquiry. Given this evidence, a jury could find that the denial, or disparate treatment, of Dr. Merrill's application was solely because he was an osteopathic physician.

Finally, the fact that Dr. Merrill's application was eventually granted does not insulate Agnesian from liability under the statute. Wisconsin law allows any person suffering a pecuniary loss because of a violation of § 50.36(3)(a) to recover "the amount of the pecuniary loss, together with costs and disbursements, including reasonable attorneys fees." Wis. Stat. § 50.39(6). By the time Agnesian changed its position and officially granted Dr. Merrill's application, the position offered to him by Aurora had been withdrawn and he had returned to Iron Mountain to re-establish his practice there at substantial cost to him and his family. Agnesian's belated decision to grant his application did not wipe away the loss Dr. Merrill claims he sustained.

Agnesian suggests that any losses sustained by Dr. Merrill are due to his own "errors in closing a practice and buying a home before he even knew that he could get privileges at the local hospital." (Def.'s Reply Br. at 3.) Agnesian also notes that Dr. Merrill made no effort to get privileges at any other hospital in the area. (*Id.*) But the questions of whether the losses claimed by Dr. Merrill were caused by Agnesian's denial of his application and whether Dr. Merrill could have mitigated his losses are for a jury to decide. Agnesian is not entitled to summary judgment

10

simply because the alleged losses could have been avoided if Dr. Merrill had acted differently. There may be a question of whether he acted reasonably, but that too would be for a jury to decide.

**III. Waiver**

Agnesian argues that Dr. Merrill waived his right to bring this action against it by signing a form entitled "Acknowledge, Consent and Release" when he applied for privileges. In pertinent part, the form states:

> I hereby release from liability and agree not to seek any civil redress from all representatives and agents of St. Agnes Hospital and its Medical Staff, collectively and individually, for their acts performed in good faith and without malice in connection with evaluating my application and my credentials and qualifications. I hereby specifically release from any liability and agree not to seek any civil redress from any and all individuals and organizations who provide information to the Hospital and its Medical Staff, in good faith and without malice, concerning my professional competence, ethics, character, and other qualifications for staff appointment and clinical privileges. I hereby consent to and specifically authorize and permit the release of such information.

(Mugan Aff. Ex. A at 2.) Agnesian argues that by signing this form as part of the application process, Dr. Merrill waived any right he otherwise had to seek "civil redress from all representatives and agents of St. Agnes Hospital and its Medical Staff, collectively or individually, for their acts performed in good faith and without malice in connection with evaluating his application." (Def.'s Br. at 11.)

Wisconsin law disfavors exculpatory agreements. *Atkins v. Swimfest Family Fitness Ctr.*, 2005 WI 4, ¶ 12, 277 Wis.2d 303, 691 N.W.2d 334. While the Wisconsin Supreme Court has not declared exculpatory clauses invalid per se, it has held that such provisions must be construed strictly against the party seeking to rely on it. *Id.* (citing *Yauger v. Skiing Enters., Inc.*, 206 Wis.2d 76, 81, 557 N.W.2d 60 (1996); and *Merten v. Nathan*, 108 Wis. 2d 205, 210-11, 321 N.W.2d 173

11

(1982)). Generally, Wisconsin courts analyzed exculpatory agreements on principles of contract law and on public policy grounds. *Atkins*, at ¶ 13. Under the contract law analysis, the inquiry is whether the language of the agreement is broad enough to cover the activity at issue. If it is not, the exculpatory clause does not apply and that ends the inquiry. If the language does cover the activity, the court then continues to determine whether enforcement of that agreement would offend public policy. *Id.*

Here, the analysis ends with consideration of the language used in the Release. The clause upon which Agnesian relies to relieve it from any potential liability applies to "all representatives and agents of St. Agnes Hospital and its medical staff, collectively and individually". (Mugan Aff. Ex. A at 2.) It says nothing about the hospital itself or Agnesian. Thus, while it may release the agents of Agnesian, individually and collectively from any liability, it has no effect on the liability of their principal, namely Agnesian. Contrast this with the following language that appears in the next paragraph on the form Dr. Merrill signed:

> In consideration for the Hospital processing my application for appointment and/or reappointment, I hereby further authorize and consent to the release by this Hospital, its agents and/or representatives of its Medical Staff to other hospitals or their medical staffs, to licensing authorities, the National Practitioner Data Bank, and to medical associations of any information the Hospital and Medical Staff may have concerning my professional competence, character and ethical qualifications and experience as a medical staff member, so long as such release of information is done in good faith and without malice. *I hereby release from liability and agree not to seek any civil redress from, this Hospital, its administrative personnel and agents, and its Medical Staff, collectively and individually, for doing so.*

(Mugan Aff. Ex. A at 2.) (italics added). Agnesian clearly knew how to write a clause releasing the principal, as well as the agents, from individual or collective liability. The fact that it did not list St. Agnes Hospital or Agnesian among the parties released from liability for actions relating to

12

the evaluation of Dr. Merrill's application suggests it did not intend the release to apply to them. Regardless, of its intent, however, the release by its terms does not apply.

It is also noteworthy that the form only released the representatives and agents of the hospital and its medical staff from liability for actions "performed in good faith and without malice." (Mugan Aff. Ex. A at 2.) Dr. Merrill contends, however, that the evidence would support a finding that the members of the Ob/Gyn Department were not acting in good faith at the time they refused to grant his application. Dr. Merrill notes that at the time he applied for staff privileges, Aurora did not have an Ob/Gyn physician with staff privileges at St. Agnes Hospital. All eight members of the Ob/Gyn Department at St. Agnes were partners in the eighty-physician Fond du Lac Regional Medical Center, the largest medical clinic in the community. (Pl. PFOF ¶ 27.) As a result, Dr. Merrill contends, denying his application "continued the Fond du Lac Regional Medical Clinic's monopoly on Ob/Gyn services in the City and barred a powerful rival from the medical marketplace." (Pl.'s Br. at 2.) Given this possible motive the members of the Department would have for preventing him from joining the St. Agnes staff and the manner in which they handled his application, Dr. Merrill argues that a jury could conclude that those involved in the decision did not act in good faith.

Agnesian vigorously disputes the suggestion that its medical staff members may have been acting in bad faith and characterizes plaintiff's suggestion to the contrary as "attempts at obfuscation" and "unfounded allegations." (Def.'s Reply at 1.) Whether members of the Department held such motivation or not, however, cannot be determined on the record as it now stands. As Dr. Merrill notes, "[s]ummary judgment is notoriously inappropriate for determination of claims in which issues of intent, good faith and other subjective feelings play dominant roles."

13

(Pl.'s Br. at 25 (quoting *Pfizer, Inc. v. Internat'l Rectifier Corp.*, 538 F.2d 180, 185 (8th Cir.1976)).) Here, it is sufficient to note that even if the form Dr. Merrill signed could be construed to cover Agnesian, the good faith exception to the release would still preclude summary judgment in its favor.

**IV. Immunity under Wis. Stat. § 146.37(1g)**

Agnesian also argues that it is entitled to summary judgment as it is insulated from liability by virtue of Wis. Stat. § 146.37(1g), which provides:

> Except as provided in s. 153.85, no person acting in good faith who participates in the review or evaluation of the services of health care providers or facilities or the charges for such services conducted in connection with any program organized and operated to help improve the quality of health care, to avoid improper utilization of the services of health care providers or facilities or to determine the reasonable charges for such services, or who participates in the obtaining of health care information under ch. 153, is liable for any civil damages as a result of any act or omission by such person in the course of such review or evaluation. Acts and omissions to which this subsection applies include, but are not limited to, acts or omissions by peer review committees or hospital governing bodies in censuring, reprimanding, limiting or revoking hospital staff privileges or notifying the medical examining board or podiatrists affiliated credentialing board under s. 50.36 or taking any other disciplinary action against a health care provider or facility and acts or omissions by a medical director in reviewing the performance of emergency medical technicians or ambulance service providers.

At the outset, it should be noted that the statute, like the release on the form Dr. Merrill signed as part of the application process, contains a good faith exception to the immunity provided. Because, as noted above, Dr. Merrill has placed in dispute the good faith of the Department members, Agnesian would not be entitled to summary judgment on the basis of § 146.37(1g), even if it otherwise applied. But it is clear from a review of the language of the statute that it does not apply.

14

The purpose of this peer review statute is "to improve the quality of health care by encouraging persons to participate in the review of health care providers." *Limjoco v. Schenck*, 169 Wis. 2d 703, 711, 486 N.W.2d 567, 570 (Wis. Ct. App. 1992). The good faith of those immune under the statute is presumed and the individual challenging this presumption must overcome it with clear and convincing evidence. Wis. Stat. § 146.37(1m); *Rechsteiner v. Hazelden*, 2008 WI 97, ¶ 33, 753 N.W.2d 496, ¶ 33. The immunity provided by the statute, however, is for the peer review process used to evaluate services or charges for services. Agnesian's attempt to invoke the protection of the statute must fail as Dr. Merrill is not challenging Agnesian's review of his services or charges, but rather its review of his credentials to begin practicing within the department.

Even if § 146.37(1g) could be construed to cover the determination whether to grant hospital privileges in the first place, it could not be reasonably thought to cover the decision to deny osteopathic physicians an equal opportunity to obtain privileges because that issue is specifically addressed by §§ 50.36(3)(a) and 50.39(6). To so read the statute would create an impermissible conflict with § 50.36(3)(a), which specifically prohibits such discrimination, and § 50.39(6), which imposes civil liability for losses caused by such discrimination. "Construction of statutes should be done in a way which harmonizes the whole system of law of which they are a part, and any conflict should be reconciled if possible." *Muskego-Norway Consol. Schools Joint School Dist. No. 9 v. Wisconsin*, 35 Wis. 2d 540, 556, 151 N.W.2d 617, 625 (Wis. 1967). If follows that the immunity afforded by § 146.37(1g) does not extend to violations of § 50.36(3)(a).

The reference to § 50.36 in § 146.37(1g) does not change the result. Read in conjunction with § 50.36, the reference to the notification of medical examining boards or podiatrist affiliated credentialing boards is best interpreted as a reference to §§ 50.36(3)(b) and (c). Both of these

15

subsections discuss reporting where hospital staff privileges are lost, reduced or surrendered "as a result of a peer investigation or written notice thereof." Wis. Stat. §§ 50.36(3)(b) and (c). No such action was taken here. Accordingly, Agnesian is not immune to Dr. Merrill's claim under § 146.37(1g), and its motion for summary judgment will be denied. Dr. Merrill's motion for leave to file a response to the additional proposed findings of fact Agnesian filed with its reply or, alternatively, to strike the additional findings is denied as moot since the additional proposed findings have no bearing on the outcome.

## CONCLUSION

For the reasons set forth above, Agnesian's motion for summary judgment (doc. # 21) is denied, and Dr. Merrill's motion for leave to file a response or, alternatively, to strike Agnesian's additional proposed findings of fact (doc. # 39) is denied as moot. The Clerk is instructed to place this matter on the calendar for further proceedings.

**SO ORDERED** this   23rd   day of February, 2009.

     s/ William C. Griesbach
     William C. Griesbach
     United States District Judge